The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez! Oyez! Oyez! All persons having any manner or form of business before the Honorable of the United States Court of Appeals for the Fourth Circuit are admonished to draw nine and give their attention for the Court is now sitting. God save the United States and this Honorable Court. Please be seated. Welcome everybody to the Fourth Circuit. We have four cases on the docket this morning. Before we begin, I want to welcome and thank my colleague Judge Catherine Eagles from the Middle District of North Carolina who is taking a break from her regular day job to join us here this morning. We appreciate that. So, thank you. Thank you for having me. All right. We will hear argument in our first case, United States v. Gordon. Mr. Bryant. Thank you. Good morning. May it please the Court, my name is Patrick Bryant and along with my colleague Valencia Roberts I represent Ronald Gordon in this appeal. The Marine Corps police officers who encountered Ronald Gordon violated his Fourth Amendment rights in two independent ways by illegally seizing him and illegally searching his car. I would like to address both of those issues this morning. First, we have to judge the seizure encounter at the moment that Mr. Gordon was seized by police which is when he was ordered out of his vehicle and he submitted to that order by police authority. At that moment, all the police officer knew was that Mr. Gordon's car had suffered some damage, a flat tire, that Mr. Gordon had a bit of... It was more than a flat tire, right? There was debris from the vehicle on the roadway, correct? We don't have an exact account of how much debris. I think there was some debris. It was more than a flat tire. It was a tire blowout and some damage to the rim, but the officer testified three times that he thought the car was drivable. That's on 91 twice and 121 of the joint appendix. That's important because, Your Honor, that's some evidence of what kind of condition the car was in. If it were obviously totaled, that's a different... It doesn't have to be totaled for there to be suspicion of DUI, correct? That's correct, but a flat tire is a relatively innocuous circumstance. I'm sorry, though, I interrupted. You were going to lay out the litany of things that are not a litany in your viewpoint. The only things that the officer knew at the time. I'm happy to go into detail with any of these, but certainly there was damage to the vehicle. We don't dispute that, but I do contend that it was not extensive damage that was somehow so unusual that might not happen to anyone driving down the road. I guess maybe I don't understand that point. Are you suggesting that the officer should have simply walked away? No, I'm simply saying that this was not the kind of thing that couldn't happen to anyone on the road, so it's not inherently suspicious. It's not so obvious that the car had been involved in an accident. The officer... It certainly at least warrants inquiry, right? Certainly. We're not disputing that the officer had the perfect right to go up and talk to Mr. Gordon. We haven't contested the initial encounter, which was either a consensual police encounter or something that was drawn out of the officer's community caretaking responsibility. He's perfectly allowed to inquire, to go up, even to wake up Mr. Gordon. We haven't disputed that aspect of it. But all at that point he gathered was that Mr. Gordon, the testimony on page 95 of the record was he looked like he just got out of bed because it's one o'clock in the morning and he woke him up out of a slumber. And he had slurred speech. He had slurred speech and red watery eyes, which again is not entirely inconsistent with being awoken by surprise at one in the morning. Well the officer testified that he said, this is at Joint Appendix page 95, that he got an alcoholic beverage removed from the vehicle. Well that certainly came later. He didn't testify that he saw that before the arrest. Before he got him out of the car. Right. That only came later. The officer, Officer Weston, who had the initial encounter and who was the officer on the scene, the only officer at that time who, well I'm sorry, in fact there were EMTs who were on the scene, but Officer Weston was the only one who spoke to Mr. Gordon at that point and ordered him out of the vehicle. He's not the one who did the inventory search. So my reading of the record is that that didn't happen until after he was ordered out of the vehicle. But you think that a damaged tire, red eyes, slurred speech, no shoes and shirt, and asleep in your car at 1 o'clock in the morning, when the car is damaged, does not give the officer cause to get somebody out of the car? Respectfully, Your Honor, no. It certainly would permit further investigation. And that's exactly, it's all we ask the police to do here, is to gather the facts and not jump to a conclusion. And there's nothing here that is inconsistent with someone having a flat tire, pulling off in a safe. So where would that further investigation have been here? Well it would have been further discussions with Mr. Gordon to determine what had happened to the vehicle, if he needed assistance, if he was parked there overnight, if he had a plan for dealing with the car, any of those sort of things might have allowed the officer to gain further evidence. And then also, I think at some point we're going to have to deal with the issue of the odor of alcohol, if the officer had, during that encounter, smelled alcohol, that might be enough. Well didn't he test, didn't his probable cause statement indicate that he had? That's in the statement, but. So why isn't that part of the record? It's in the record, and I'm not disputing that it doesn't exist. It was not testified to at the hearing. Why does that matter? Because this is an evidentiary hearing that requires the government. Does the court have to hold an evidentiary hearing to rule on a motion to suppress? It's not required. Well then why does it matter? Whether he testified to it or not, if the court could have decided based on the motion alone to which the police report was attached, why does it matter that he didn't testify about it? We would still be appealing because there's not sufficient facts in the record at the point of the seizure. We would argue at that point that it's a clearly erroneous factual finding. Even including the odor of alcohol? I don't think that's enough. I realize that's a closer call. But Mr. Gordon's car had been there for as long as 50 minutes. There's nothing obviously saying that he might have pulled off to the side of the road and taken a drink at that point once he was parked in the vehicle. There are all kinds of possibilities, but we're not talking about proof beyond a reasonable doubt. It's just, you know, it's not a high burden. Well, I understand that, but it has to be more than a hunch. And the important thing about the reasonable suspicion standard, Your Honor, is that it would eliminate a substantial portion of innocent travelers. And what we have here is something that is completely consistent with someone having car trouble, pulling off to the side of the road, and sleeping until morning to deal with it in the morning because he's not going to be able to fix his tire in the middle of the night. And it's also not inconsistent with someone who might be living in their car. And that's a situation that I don't think would give reasonable suspicion if someone, for example, was sleeping in their car habitually, might be living out of their car, that person might smell of alcohol, and that doesn't necessarily give the police reasonable suspicion that that person has immediately been committing a crime. Of course, here we know that the car wasn't there, what, 50 minutes beforehand or some period, some fairly short period of time before, right, because the officer had been back. That's true, but 50 minutes is not five minutes. It's a fairly significant period of time that he could have been sitting there, he could have been having alcohol at that point, or at the very least could have fallen into a fairly deep sleep that required him to be awakened. So... What did the appellant say when the officer approached his vehicle? I don't believe that his exact statements are in the record. I think he was a little bit, I think the statements from the officer was that he was a little bit confused about exactly why he was being awoken so suddenly, and I think he was just a little bit disoriented, which, again, is a perfectly appropriate response at one in the morning to being shaken awake by surprise. I don't think he was expecting to be woken up at that moment, and so he, huh, what, where am I? I mean, I don't think that those are completely untoward questions. We don't expect somebody to be completely poised at that moment, even if it is a police officer talking to him. Coming back to the police report, if the judge had ruled without an evidentiary hearing, maybe this is a different case. But because there was here, we have to look at the entire record, the totality of the For all we know, the officer intentionally did not testify about an odor of alcohol at the suppression hearing. We honestly don't know. That could have been an intentional choice on the officer's part not to rely on that fact, and so we can't assume that everything in a declaration or a probable cause statement would have come out exactly the same, and when it's inconsistent or at least not bolstered by anything that happened at the evidentiary hearing, I think we have to look at all the evidence and say that it's clearly erroneous, because the clearly erroneous standard allows for at least some evidence. It's not, even when there is evidence in the record, something can be clearly erroneous. But here, where the only evidence is this statement that is really not much different than a proffer on the part of any party, and I apologize. I think we also have to consider the opposite situation. If defense counsel had attached a simple declaration from Mr. Gordon that he had not been drinking, and then the district court had relied on that to find it as a fact, I think the government would probably have a problem with that. If that's all there was, it's just a bare statement that when the officer gets on the stand and doesn't say it, I think it's kind of a dog that doesn't bark, and we have to take that into account as well. Especially because we have to remember it's the government's burden to bring forth evidence, and when they didn't do that at the evidentiary hearing, that's something that's lacking. And so, with regard to the reasonable suspicion quantum of evidence that we have, I would urge the court to consider the cases that we've cited, especially Slocum and Wingate, that there is nothing inherently suspicious about having car trouble and pulling off to the side of the road, and what the officer should have done here is continued the investigation and gathered more evidence before ordering Mr. Gordon out of the car. Such as walking around it and seeing a gun in plain view, which you did not address in your reply brief? Well, I think with regard to the plain view issue, going back to Coolidge v. New Hampshire, the original plain view case, what's important there is that the police were in a position they were allowed to be at the moment the item was seen. It has to actually have been in plain view at that point, and Coolidge says that simply because something is in plain view is not enough by itself. It says it's never by itself sufficient to allow for the seizure of the item. And what I think the government is trying to do is put the cart before the horse to some respect and say that because it's really like inevitable discovery that, well, we would have discovered it if we had done it the right way, if we had followed the right steps, so therefore you should allow it. But there weren't facts about that. Again, it's a government burden because it's an exception to the warrant requirement, and the government didn't put facts in about what would have happened if they had followed the right steps like inevitable discovery, and that requires a factual finding on the district court's part. So I think because the officer candidly testified that he did not see the gun until after he had opened the car door, then I think the plain view exception doesn't apply for that reason. And with the time I have remaining, I'd like to touch on the inventory search policy. The search here did not comply with the inventory policy that the government submitted. Again, it's a government burden to submit the policy and to prove it up, and the policy that was here only applied aboard Marine Corps installations. Here, Mr. Gordon's car was parked in the public street outside the Marine base gate, and so the reasons for a policy that might apply on the gate, security issues and the need to maybe tow a car because there's limited parking on a base, doesn't apply in public. And we just don't know. It's simply there's not enough evidence in the record to say what would have happened if, for example, they had submitted a different policy that applied outside the gate or if they had brought in the Prince William County policy because there's concurrent jurisdiction there. Well, I mean, the government's argument here is that you've got both the written policy and then you've got the testimony of the lieutenant who was responsible, not solely, I suppose, for implementing the policy, which put a gloss on exactly how that policy was applied and that the towing requirement extended beyond the confines of the gate to this area, which is, I mean, still part of the jurisdiction of the of the PMO in this case. Right. So why isn't that a reasonable sort of gloss and interpretation on the written policy? Well, two answers to that. One is that an ordinary traveler who hasn't arrived at the gate might pull over here and not have any idea that they're going to be subject to inspection or or possible towing or inventory like they would be with a warning. If I may finish. Thank you. And then the other response that I have to that is that the officer's subjective good faith or belief that because I had done it before, I could do it again isn't really relevant here because we don't know if any of those other situations were litigated and the officer had maybe gotten some approval that what he had done was fine. The plain letter, the black and white language of the inventory policy says it only applies aboard installations. So I think it's it's sort of a leap of logic to say that it therefore applies outside the investigation.  If there are no further questions now, I'll reserve the rest of my time. Thank you, Mr. Bryant. Mr. Blanchard. Good morning, and may it please the court, Alex Blanchard and Colin Norton for the United States. Your honors, I'd like to address first the issue of reasonable suspicion for the investigatory stop here and to set the table, recount some of the pertinent facts that have already been addressed here that were confronted by Officer Weston on the night in question. At 109 in the morning, Officer Weston encountered a vehicle that was not present in the public parking spot where he had patrolled about 45 minutes earlier. That vehicle had a blown out tire, a destroyed hubcap and significant damage to its rim. Upon approaching the driver of this vehicle, Officer Weston encountered the defendant who was shirtless, shoeless, disheveled and unconscious. It took Officer Weston several shakes and nudges. Unconscious. Does it say unconscious in the record? I think it does in different. Did the officer testify that he was unconscious? I must have missed that. I think there was testimony to that effect, but I think that there was also testimony that he was asleep. But even assuming, Your Honor, that he was merely asleep, it took several nudges to rouse him. And when he was roused from his slumber, he had red and glassy eyes. His speech was slurred. And importantly, he didn't know where he was. Now, my friend on the other side has suggested that maybe this was somebody who just had some car trouble and pulled over and went to sleep because it was late at night. I would submit that somebody under those facts wouldn't have trouble knowing where he was. This not knowing where he was was consistent among all the other facts with him driving under the influence. And so those facts combined with a strong order. All of those facts also could be consistent with just sleeping in your legally parked vehicle and being suddenly aroused and not knowing what's going on. So absent the odor of alcohol, those factors could still be consistent with just maybe you blew your tire out and pulled over to sleep before fixing it in the morning, as opposing counsel suggested. Respectfully, Your Honor, I don't agree with that because here we have the slurred speech and the red and glassy eyes, which are often cited by courts as indicia of driving under the influence. I think without those facts, you might quite be right, Your Honor. But here in the totality of these factual circumstances, it was perfectly reasonable for an officer like Officer Weston relying on his common sense to reasonably suspect the driver, the defendant, had been driving under the influence. Now, as we've articulated in our brief, we think that there is sufficient facts to meet the reasonable suspicion standard here, even without the strong odor of alcohol that the officer noted in his police report was emanating from the driver's side window. But we do think that the court was entitled to rely on that fact. And there was a question posed to opposing counsel earlier about why the court couldn't rely on this fact if courts don't have to hold hearings in the context of a suppression motion. And that's exactly right. And I would submit that the defendant himself anticipated that possibility here by attaching the very same police report as an exhibit to his motion to dismiss. Importantly, Your Honor, this is on page 11 of the joint appendix, which is the portion of the defendant's motion to suppress. He says, reportedly, Officer Weston also smelled an odor of alcohol emanating from the vehicle and then cites to that police report, which was also attached to the government's response. Thereafter, during the hearing, when the defendant had an opportunity to cross-examine Officer Weston, there was no questioning about that fact whatsoever. And then when the government mentioned it in its argument to the district court, and when the district court mentioned it during its recounting of its reasons to deny the motion to suppress, there was never any argument or interjection by the defendant that that was a fact the court wasn't permitted to rely on. So here, because of the defendant's forfeiture of that argument, the district court's reliance on that fact subject to plain error review, we would submit that it is not plain error and that even if it was plain error, it didn't affect the defendant's substantial rights because, as I mentioned, here there was sufficient factual basis for reasonable suspicion, even notwithstanding the strong odor of alcohol. So for those reasons, Your Honors, we ask that you affirm the district court's decision below that there was reasonable suspicion to support the investigatory stop. Now, as to the inventory search, here, each of the requirements for a permissible impoundment of a vehicle and subsequent inventory search were satisfied. Here, the impoundment was reasonable. And the question is not, as the defendant would like it to be, whether impoundment and subsequent inventory search was necessary, but rather just whether it was reasonable. And here it was. And we know that by looking at this Court's decision in Brown and the Supreme Court's subsequent year in Bertin, both of those cases involved motorists who were apprehended upon suspicion of driving under the influence. And in both of those instances, there was a decision posed to the officers about whether to impound the vehicle or simply leave it in the parking spaces where those vehicles were parked, locked overnight. And in both instances, the courts, this Court and the Supreme Court, upheld the officer's decision to impound the vehicle, finding that that was a reasonable thing to do in that circumstance. In Brown, as here, there was no one immediately available to take custody of the vehicle and drive it somewhere else. Therefore, if the police had simply left the defendant's vehicle in the parking spot, it would have been subject to vandalism, could have been subject to a theft of items inside it. And so the officers invoking their policy decided to impound, tow, and inventory search this car. Now, there's been a question about whether this policy, that is the Marine Corps' impoundment policy, applied in this circumstance and whether it was complied with. And I think there's been a conflation here of those two things, whether it applied and whether it was complied with. The defendant would argue that because the policy says that it applies aboard Marine Corps installations, that that can't mean that it would apply outside of the gates of the installation, in this case, Marine Corps Base Quantico. However, the District Court found, and we would submit that this finding is subject to clear error review, and that this is not clear error, that the policy did apply and relied on the testimony of Lieutenant Cliff, that this inventory policy was not had been applied previously to civilian vehicles traveling outside the gates of the installation on a public road like Fuller Road, in this case. And so the District Court's finding that this policy applied. So are you saying that a policy like this would be okay no matter the extent of the deviation from the written terms of the policy? I mean, read literally, this policy suggests that you have to conduct the search within the confines of the gate, and it doesn't, at least, again, read literally, suggest that a search in this particular area was authorized. So how far can you deviate from a written policy? Well, I think there's a difference, Your Honor, between contravention of a procedure set forth in a policy and whether a policy applies in a particular factual circumstance. And this is contemplated by this Court's decision in Banks, which was not a vehicle case, but was a case about the validity of an inventory search. And here this Court, in that case, rather, this Court said that the question isn't whether the particular unique factual circumstance that arose in that case was contemplated by the policy, but whether the officer who conducted the inventory search complied with standardized procedures, quote, more generally, is what this Court said. And so here... Yeah, but those were, as I recall, procedures with respect to the actual impounding of the vehicle, the sort of the step-by-step procedure to take. This is a much broader argument from the defense that the policy simply didn't apply at all because it just, read literally, only suggests that an impoundment can only take place within the confines of the gate. So the first point I would make, Your Honor, is that we believe the District Court correctly found that it did apply. But if you accept the defendant's argument that a board means within the gates of and that the policy, therefore, didn't apply, it doesn't affect the outcome here. And that's because, as courts have found over and over again, a inventory policy doesn't have to be written. What's required is simply compliance with standardized procedures. Here, it happens to be the case that in this factual circumstance, the written policy was adopted and followed by Lt. Cliff to a T. And so there's no issue here that standard procedures weren't followed. In fact, they were. What is the government's definition of a board? What does a board mean? Well, we think that it means, essentially, coextensive with the jurisdictional reach of the Marine Corps. So in this case, we think that it wouldn't be read literally to mean only within the gates, that it is a fair interpretation based on the ambiguity of the word and then the practice of the Marine Corps for the District Court to have found that it did apply. But again, even if it doesn't apply, even if a board strictly means within the gates, here it doesn't matter because there was compliance with standardized procedures. There was testimony from Lt. Cliff that it was standard practice when a motorist was apprehended on suspicion of DUI to immediately inventory the vehicle. How far outside of the gates would appellant had to have been to not be aboard the Marine base? Well, if the defendant had been stopped in a place where there wasn't concurrent, excuse me, concurrent jurisdiction, then there simply wouldn't have been jurisdiction at all for the stop and for the impoundment and inventory search. So in addition, Your Honors, the courts have held that absent a finding that there was an investigatory purpose behind the inventory search, in other words, when there's no evidence, as there isn't here and as there's been no argument here, that there's bad faith on the part of the searching officer, as long as there's a compliance with standardized procedures, then that's a valid inventory search. Here, there's no dispute that this search was conducted in good faith. Now beyond those arguments, Your Honor, Judge Eagles referred to the argument that wasn't addressed in the defendant's reply brief that we've set forth as an alternative in the court were to deem the inventory search invalid for failure to comply with the policy as written. And that argument is that with respect to the gun here, that gun was in plain view and therefore the search that occurred when the officer viewed that firearm did not invade any privacy interests and therefore wasn't a search under the Fourth Amendment. And so given that the object itself, the firearm, didn't have any inherent right or privacy to it, the officer's observation of that gun was valid under the Fourth Amendment and he was entitled to seize that gun under the community caretaking exception to the Fourth Amendment's requirement. And so for those reasons, Your Honor, even if you find that the inventory search was not valid here, there would still be a reason to uphold the district court's finding that this seizure of the firearm comported with the constitutional requirements. Unless the court has any additional questions, we'll rely on our brief and ask that you affirm. Thank you. Thank you. Mr. Bryant, you've got some rebuttal time. Thank you, Your Honor. Just a couple of points I'd like to make in response to the government's argument. First, the government mentioned defense counsel's opportunity to cross-examine or to object at the hearing. Again, it's not our burden to make the government's case for them and to point out factual deficiencies or things that they didn't testify to for reasons of their own knowing. And I think one thing that's also important to consider is that if you look carefully at the… I think part of government counsel's point was that this is plain error review on that issue. Well, I think that's incorrect, Your Honor, because, again, if the judge had taken this under advisement and just issued a written ruling, we wouldn't have any opportunity to object at that point. We would just file an appeal. And so when a judge is making a factual recitation, factual findings and conclusions of law, defense counsel shouldn't be required to interrupt every point and object. All that's required under the contemporaneous objection rule is to say what we want and why we want it and then for the judge to say something else. And at that point, all we can do is appeal. And again, when it's not our burden, it's not incumbent on defense counsel to remind the government maybe of things that they forgot. And so I think if you look at page 172 and 173 of the appendix where the judge's factual findings and conclusions come, the court is also talking about probable cause to arrest, which the officer gathered after Mr. Gordon was out of the car and he had gone through the field sobriety test, we haven't challenged that on appeal. But I think a fair reading of the record is that a lot of the things that the government thinks that we should have objected to are really things that go to probable cause, like Mr. Gordon's difficulty balancing on his feet and any findings about the odor of alcohol were related to things that went to probable cause to arrest, which we haven't challenged. So I think that's the distinction there. Very quickly about the inventory policy. We simply don't know what policy would have applied because the government didn't put on evidence about outside the base gates. We have to remember that the town of Quantico, part of Interstate 95, runs through the Quantico marine-based boundary jurisdiction. So there could be completely different rationales for dealing with cars. We're talking about private homes and businesses that are within that perimeter, to my knowledge. And so the police might have completely different rationales and policy for dealing with cars that aren't subject to tow outside that perimeter. I'm still just having a little trouble with the fact that there was a gun in the backseat. There's a picture of it in the record. So put aside the initial getting him out of the car argument, but you're talking about the inventory search. Let's say they said, OK, we're not going to do an inventory search. They have to get in the car and roll up the windows, right? Because the windows were all down. And it's OK to walk around. And then they see a gun in the backseat. And you're saying they shouldn't have been able to do an inventory search when they see a gun in a car parked right outside the gates of a military installation. Well, that just doesn't make sense, does it? My response to that is first to say the photograph that's in the appendix wasn't taken from the officer's vantage point through the car window. So that's after the door had been open. So I just want to say that's not exactly what the officer saw. That's what happened after he opened the door. And for the plain view exception to apply. But if the windows were rolled down, what does it matter? Which they were, according to the officer's testimony. All of them. Right. And my response to that is simply that in order for the police to do anything about that, they have to be somewhere that they're constitutionally able to be. And they had already violated Mr. Gordon's rights by that point, both by seizing him and by getting out of the car. The fact that something could have been seen by someone is simply not enough. It's like the Where's Waldo books. Waldo's somewhere on that page. But until you actually see him, it's not over. And here I think that what's important is that the government, again, is putting the car before the horse. And importantly, the district judge did not make a factual finding. That testimony is in the record. But the judge didn't say anything in his factual findings about plain view. If I can make one very minor point, I know my time's expired. Very quickly, a ruling for Mr. Gordon would have limited applicability because these are rather unique facts, including the government's evidentiary failure at the hearing. But a ruling in favor of the government would have broader application because we have to think of what would an innocent traveler do, an unsuspecting person who has car trouble, pulls off to the side of the road. Under the government's theory, that person would be subject to being rousted and roused by the police and pulled out of their car based on no more facts than the government presented here. And so for those reasons, we ask this court to reverse Mr. Gordon's conviction. Thank you. All right. Thank you, Mr. Bryan. Thank you both for your arguments this morning. We appreciate that. We typically would come down from the bench and greet you personally. But for reasons that I think are obvious to you, we're not doing that, at least for now. Hopefully, we'll resume that tradition at some point down the road. But know that you leave here with our thanks and gratitude for your work in this case. Thank you. Thank you.
judges: Albert Diaz, Stephanie D. Thacker, Catherine C. Eagles